**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF LOUISIANA**
**SHREVEPORT DIVISION**

ELLIOT GARNER, ET AL.                    CIVIL ACTION NO. 21-0228

VERSUS                                   JUDGE S. MAURICE HICKS, JR.

CITY OF MANY, ET AL.                     MAGISTRATE JUDGE HORNSBY

**MEMORANDUM RULING**

Before the Court are three Motions to Dismiss challenging the sufficiency of Elliot

and Rose Garner's (collectively "Plaintiffs" or "the Garners") civil rights allegations brought

individually and on behalf of their minor child, P.G. See Record Documents 5, 15 & 21.

Each motion is opposed. See Record Documents 13, 27 & 29.

**FACTUAL BACKGROUND AND PROCEDURAL HISTORY**

The following facts are taken from Plaintiffs' Amended Complaint,[1] and are

considered in the light most favorable to the Garners. See Record Document 26. On

January 28, 2020, Plaintiffs' child was held down and sodomized in the Many High School

locker room by nine fellow students with a mechanical pencil and their fingers. See id. at

¶31. Although an athletic coach walked in on the attack, local law enforcement was not

contacted, nor were the Garners immediately informed of what had taken place. See id.

at ¶¶31-32. Rose Garner became aware of the incident on Friday, January 31, 2020,

when an individual showed her a video of the attack, which had been posted on the

internet. See id. at ¶¶16-19.

---

[1] Although Plaintiffs' Amended Complaint was filed after the three pending motions to dismiss, the
Defendants continue to pursue dismissal, except where otherwise noted.

After viewing the video, Rose Garner made a recording and returned home to confirm what had happened with P.G. See id. at ¶¶19-20. She then took P.G. to the Sabine Parish Sheriff's Office to file a report but was not permitted to make a statement or leave a copy of the video, instead being redirected to the City of Many Police Department. See id. at ¶¶21-23. Once there, she was advised the individual she needed to speak with was not present and instructed to return on Monday, February 3. See id. at ¶24. She returned an hour later and forced an officer to watch the video, make a recording of it, and take down her information. See id. at ¶¶25-26. Nevertheless, the officer advised her that nothing could be done until after the weekend. See id. at ¶27.

Upset and frustrated, she telephoned the Louisiana State Police, who launched an investigation into the sexual assault. See id. at ¶28. Later in the evening on January 31, Many High School's assistant principal finally called Elliot Garner, but did not discuss the nature or extent of the incident, only stating that "something happened with P.G., but it will be taken care of by Monday." See id. at ¶30. Ultimately, the Louisiana State Police drafted and filed arrest warrants against six suspects. See id. at ¶34.

## LAW AND ANALYSIS

Plaintiffs' Amended Complaint spans fifty pages and over two hundred paragraphs. See id. It names nearly a dozen Defendants. See id. at ¶8. The Amended Complaint explicitly labels claims for (1) Equal Protection and 42 U.S.C. § 1983; (2) Due Process and § 1983; (3) civil conspiracy, § 1983, and 42 U.S.C. § 1985; (4) Fourth Amendment violations; (5) policies, procedures, or lack thereof; (6) intentional infliction of emotional distress; (7) abuse of process; and (8) direct action recovery.

The Amended Complaint struggles to attach specific allegations to particular Defendants, opting instead to generalize the vast majority of its assertions. Accordingly, the Court is left to decipher which claims and which allegations within them pertain to each Defendant based solely on the nature of the contentions. With this task set forth, the Court is prepared to analyze the pending motions to dismiss in this matter filed by the Sabine Parish District Attorney's Office and District Attorney Don Burkett (Record Document 5), the Sabine Parish School Board (Record Document 15), and the Sabine Parish Sheriff's Department (Record Document 21).

## I.    Legal Standard

In order to survive a Rule 12(b)(6) motion to dismiss, a plaintiff must plead "enough facts to state a claim [for] relief that is plausible on its face." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007). A complaint need not contain detailed factual allegations but does require more than mere labels and conclusory statements. See id. at 555. Importantly, a "formulaic recitation of the elements of a cause of action will not do." Id. When evaluating a pleading, courts must accept all factual allegations as true, but need not accept legal conclusions as facts. See Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). "Determining whether a complaint states a plausible claim for relief [is]… a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Id. at 679. Facial plausibility is present when the plaintiff "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. at 678 (citing Twombly, 550 U.S. at 556).

II.    **Sabine Parish District Attorney's Office and District Attorney Don Burkett's Motion to Dismiss (Record Document 5)**

Plaintiffs have sued the Sabine Parish District Attorney's Office ("DA's Office") and District Attorney Don Burkett ("Burkett") in his official and personal capacities. See Record Document 26 at ¶8. The official capacity claims against Burkett and the claims against the DA's Office as a whole are duplicative, and the Court will proceed to analyze them together as claims against the DA's Office. The personal capacity claims against Burkett appear to be made against him in his role as prosecuting attorney. See id. This distinction is important because Plaintiffs' allegations state that in addition to serving as the elected District Attorney, Burkett also represents the Sabine Parish School Board ("School Board"). See id. at ¶110. This dual representation is statutorily mandated, pursuant to Louisiana Revised Statute 42:261.

A singular motion to dismiss has been filed on behalf of the DA's Office and Burkett. See Record Document 5. It argues immunity from some claims and insufficient pleading for others. See Record Document 5-1. Plaintiffs counter with attempted explanations of their precise claims to avoid immunity, and with arguments in support of the strength of their allegations. See Record Document 13.

### A. Prosecutorial Immunity and Standing

Underscoring any suit against a prosecutor or his office are the related concepts of absolute and qualified immunity. While prosecutorial acts more often than not qualify for absolute immunity, "the actions of a prosecutor are not absolutely immune merely because they are performed by a prosecutor." Buckley v. Fitzsimmons, 509 U.S. 259, 273 (1993). Rather, the prosecutor seeking absolute protection bears the burden of showing that such immunity is justified for the function he performs. See Burns v. Reed, 500 U.S.

478, 486 (1991). For state prosecutors, absolute immunity is available for conduct that is "intimately associated with the judicial phase of the criminal process." Imbler v. Pachtman, 424 U.S. 409, 430 (1976).

Courts distinguish between (1) actions taken "in preparing for the initiation of judicial proceedings or for trial, and which occur in the course of [the prosecutor's] role as an advocate for the State," and (2) "administrative duties and those investigatory functions that do not relate to an advocate's preparation for the initiation of a prosecution or for judicial proceedings." Singleton v. Cannizzaro, 956 F.3d 773, 779-80 (5th Cir. 2020) (quoting Buckley, 509 U.S. at 273). The former will be subject to absolute immunity, while the latter, so-called investigatory functions, may be eligible for only qualified immunity. See Burns, 500 U.S. at 496 (holding that a prosecutor's participation in a probable cause hearing qualified for absolute immunity, whereas legal advice he gave to police earned only qualified immunity).

Whether an act is entitled to qualified immunity depends on if the official's conduct violated clearly established statutory or constitutional rights of which a reasonable person would have known. See Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Courts must determine whether the government official's actions were objectively reasonable in light of law which was clearly established at the time of the disputed action. See Collins v. Ainsworth, 382 F.3d 529, 537 (5th Cir. 2004). Qualified immunity supports all but the plainly incompetent or those who knowingly violate the law. See Burns, 500 U.S. at 480.

Tied to the concept of prosecutorial immunity is the widely recognized rule that "a private citizen lacks a judicially cognizable interest in the prosecution or nonprosecution of another." Linda R.S. v. Richard D., 410 U.S. 614, 619 (1973). Recently, the Fifth Circuit

discussed the breadth of <u>Linda R.S.</u>, stating that "every court to our knowledge to have addressed this question prior to this case agrees that a crime victim may not challenge a prosecutor's failure to investigate or prosecute his perpetrator." <u>Lefebure v. D'Aquilla</u>, 987 F.3d 446, 447 (5th Cir. 2021). With this framework in place, the Court is prepared to analyze the instant motion to dismiss.

### B. Equal Protection

The DA's Office and Burkett argue Plaintiffs' Equal Protection claims are rooted in failures to prosecute and investigate the alleged sexual assault of P.G., as well as for advising police on how to handle the matter. <u>See</u> Record Document 5 at 2-5. Consequently, they argue for dismissal under absolute and qualified immunity, as well as for a lack of standing. <u>See id.</u> Plaintiffs clarify that the alleged failures and advice to police are not the foundation of the claims themselves, but rather examples of differential treatment towards black and white victims of crime that comprise their overarching Equal Protection claims. <u>See</u> Record Document 13 at 4-6. Plaintiffs state repeatedly throughout their opposition memorandum:

> Plaintiffs alleged that Don Burkett failed to review their case, failed to investigate the matter, failed to recuse himself (if he couldn't be fair and impartial because of dual representation of the School Board and the District Attorney's office), failed to keep victim and his family reasonably informed of the proceedings, failed to keep victim and his family reasonably informed of location and actions of perpetrators, went out of his way to instruct Chief of Police to withhold public information to the victim and his family, failed to disclose to the victim that they were or could have been entitled to benefits as victims of a crime, and unlawfully modified bonds of perpetrators unilaterally without informing the victim or his family. Plaintiffs, further, allege that these actions were taken with a discriminatory intent as the [P]laintiffs are of African American descent.

<u>Id.</u> at 1, 6 & 16. This, they argue, removes their claims from the realm of prosecutorial immunity and warrants survival under Rule 12(b)(6).

The Court disagrees. Even construing Plaintiffs' allegations in accordance with their desires, as examples of discrimination rather than independent claims themselves, the basic foundation of their alleged Equal Protection violations remains (1) disagreements with the investigation or lack thereof, (2) a failure to prosecute, and (3) advice given to police concerning the investigation. The Fifth Circuit's recent decision in Lefebure and decades of case law clearly preclude liability for any investigatory or prosecutorial decisions that victims may find objectionable.  As for legal advice to police concerning the publicization of information, qualified immunity applies because the advice provided was not objectively unreasonable in light of clearly established law. Given the sensitive nature of the crime and the minor status of the victim and perpetrators, instructing police to withhold information from the public did not violate clearly established law. Such practice, undoubtedly common in sexual assault cases involving minors, falls within the shield of qualified immunity and cannot be actionable.

Even were the Court to determine the alleged acts fall outside the realms of immunity or standing principles, Plaintiffs' Equal Protection claims fall short, as the bald assertions of discriminatory intent and the conclusory allegations of an Equal Protection violation cannot withstand 12(b)(6) scrutiny. While Plaintiffs allege discrimination dozens of times in their Amended Complaint, they do so without any supporting detail on why or how any alleged failures in the investigation or prosecution of this crime evidence an Equal Protection violation.[2] Plaintiffs' amendments to their initial pleadings do provide instances where white and black students have been disciplined differently within Many

---

[2] For example, Paragraph 65 states "[o]n information and belief, DEFENDANTS have a history of discriminating against African Americans, juveniles, and indigent people. DEFENDANTS have treated sexual assault reports from these classes of individuals with less priority than other crimes not involving these classes, with not legal, lawful, or rational basis or justification." See Record Document 26.

High School, but each of these examples concerns intra-school punishment as opposed to criminal charges brought by the DA's Office. See Record Document 26 at ¶¶51-60. Simply put, Plaintiffs have provided nothing more than conclusory allegations that the DA's Office or Burkett as a prosecutor treat black and white crime victims differently.[3]

The Equal Protection claims brought against the DA's Office and Burkett must be dismissed, as they are rooted in allegations from which prosecutors may not be held liable. Even assuming otherwise, Plaintiffs have also failed to set forth sufficiently detailed allegations to state a claim for relief under this constitutional provision. Accordingly, Plaintiffs' Equal Protection claims against the DA's Office and Burkett are hereby **DISMISSED**.

### C. Due Process

Similar to Plaintiffs' Equal Protection claims, their Due Process allegations revolve around disagreements with investigatory and prosecutorial decisions. See id. at ¶¶74-95. For example, Paragraph 86 of Plaintiffs' Amended Complaint provides:

> DEFENDANTS' failure to Investigate deprived COMPLAINANTS of their substantive due process rights by taking his property, failing to prosecute the crime, failing to investigate the crime, failing to protect, failing to present evidence to the necessary agency, and failure to prosecute all alleged perpetrators for their involvement in the crime.

See id. at ¶86. The Amended Complaint then specifically names Burkett as committing a "taking" without substantive due process by failing to pass along video evidence to the FBI. Id. at ¶87.

---

[3] At times, Plaintiffs argue Defendants, including the DA's Office, discriminate against "African American males, juveniles, and indigent people." See, e.g., Record Document 26 at ¶65. While stated in their pleadings, Plaintiffs have devoted their attention entirely to racial discrimination, offering no specific allegations or arguments concerning age or financial status. Consequently, the Court will also focus solely on potential race discrimination in its analysis.

Again, the large body of case law on this subject explicitly forecloses Plaintiffs' allegations regarding failures to investigate and prosecute that form the basis of their Due Process claims. Plaintiffs' complaints of a "taking" of their personal property—the video evidence of the assault—is likewise related to the investigation and potential prosecution of the crime. Additionally, Plaintiffs have not demonstrated how they possessed or lost a property interest in their copy of an online video from which additional copies were made by law enforcement at the behest of Rose Garner. Accordingly, this claim, too, must be **DISMISSED** against the DA's Office and Burkett.

### D. Conspiracy Claims

Next, Plaintiffs allege an overarching conspiracy to cover-up the assault and impede the investigation and prosecution of the perpetrators. See Record Document 26 at ¶¶96-114. Their claims arise under 42 U.S.C. § 1985 and for civil conspiracy under § 1983. See id. The Garners recite a lengthy list of actions that they believe evidence a prior agreement amongst, *inter alia*, the DA's office, the School Board, and law enforcement. See id. at ¶101. The DA's Office counters, once again, that the basis for their alleged role in the conspiracy remains rooted in nonviable claims. See Record Document 5-1.

Section 1985 prohibits conspiracies "for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws." 42 U.S.C. § 1985. "To state a claim under § 1985(3), a plaintiff must allege: (1) a conspiracy involving two or more persons; (2) for the purpose of depriving, directly or indirectly, a person or class of persons of the equal protection of the laws; and (3) an act in furtherance of the conspiracy; (4) which causes injury to a person or property, or a deprivation of any

right or privilege of a citizen of the United States." <u>Texas Democratic Party v. Abbott</u>, 961 F.3d 389, 410 (5th Cir. 2020) (citing <u>Hilliard v. Ferguson</u>, 30 F.3d 649, 652-52 (5th Cir. 1994)). Similarly, "the elements of civil conspiracy are (1) an actual violation of a right protected under § 1983 and (2) actions taken in concert by the defendants with the specific intent to violate the aforementioned right." <u>Angelle v. Town of Duson</u>, 2018 WL 4649788 at *8 (W.D. La. Aug. 7, 2018).

In arguing for the existence of a conspiracy involving the DA's Office and Burkett, the Garners point to (1) the failures to prosecute and investigate, (2) the withholding of information, and (3) Burkett's dual representation as District Attorney of Sabine Parish and counsel for the School Board. <u>See</u> Record Document 13 at 11-12. As discussed, these first two alleged collusive actions are protected by absolute and qualified immunity, and lack standing. This mandates the dismissal of these claims against the DA's Office.

The third allegation supporting a conspiracy with Burkett at its center, however, requires a more thorough analysis. The Court ordered supplemental briefing on this contention, particularly to address the impact of Louisiana Revised Statute 42:261, which establishes parish district attorneys as the "*ex officio*" counsel for school boards within their jurisdictions. <u>See</u> Record Document 33; La. Stat. Ann. § 42:261. Burkett and the DA's Office argue that a conspiracy between a client and its lawyer is a legal impossibility, so long as the actions of the attorney remain within the scope of the attorney-client relationship. <u>See</u> Record Document 34. Plaintiffs argue the statutorily mandated representation has no effect on their conspiracy claims, and Burkett should have recused

himself from the matter because of a severe conflict of interest.[4] See Record Document 35.

While the Fifth Circuit has not directly addressed attorney-client conspiracies, particularly in light of § 42:261, it has analyzed the general rule that agents and employees cannot conspire with their principals or employers and extended that bar to the school setting. See Hilliard, 30 F.3d at 653. In Hilliard, the court held the plaintiffs' § 1985(3) claim was properly dismissed because a school superintendent and his overseeing school board were the same collective entity, and thus, the conspiracy did not involve two or more people. See id.

Sister circuits have considered claims of conspiracies between attorneys and clients and held that so long as the attorney's actions fall within the broad scope of representation, his conduct is immune from an alleged conspiracy. See Farese v. Scherer, 342 F.3d 1223, 1232 (11th Cir. 2003); see also Heffernan v. Hunter, 189 F.3d 405, 413 (3d Cir. 1999). This holds true "even if the challenged activity violates the canons of ethics." Farese, 342 F.3d at 1232. If such an ethical violation is indeed present, sufficient remedies exist "under state law through court imposed sanctions or reference to state disciplinary bodies." Heffernan, 189 F.3d at 413.

Here, Burkett and the School Board maintain an attorney-client relationship that is perhaps even stronger than these cases due to the statutory mandate of the arrangement. Unlike the attorneys in Farese or Heffernan, Burkett did not voluntarily take on the School

---

[4] In support of their conspiracy argument, the Garners reference a former instance where Burkett recused himself and his office from the prosecution of two teachers at Many Junior High School. See Record Document 35 at 1. This allegation was first raised by the Garners in their opposition to the School Board's motion to dismiss as an accompanying news article exhibit. See Record Document 27-2. However, the Court cannot consider this extrinsic evidence on a motion to dismiss, as it was not referenced in the Plaintiffs' pleadings. See All Green Corp. v. Wesley, 2021 WL 314290 at *2 (W.D. La. Jan. 29, 2021) (citing Scanlan v. Texas A&M University, 343 F.3d 533, 536 (5th Cir. 2003)).

Board as a client, but rather was assigned this additional duty by virtue of his election as District Attorney. The actions allegedly taken by Burkett, which the Garners believe evidence a conspiracy, clearly fall within the scope of a typical attorney-client relationship. See Record Document 34 at 6-8. Further, any potential ethical violations arising from his involvement in this case have no effect on the viability of Plaintiffs' conspiracy claims. Consequently, the Garners' conspiracy claims against Burkett and the DA's Office must be **DISMISSED**.

### E.  Fourth Amendment Violation

Plaintiffs allege a Fourth Amendment violation occurred when unknown deputies of the Sabine Parish Sheriff's Office entered their home without consent or a warrant and took pictures of the home and attempted to intimidate P.G. See Record Document 26 at ¶115. According to the Garners, deputies did not knock before entering and left immediately when questioned by P.G. as to why they were there. See id. at ¶117. The Amended Complaint also states that "eyewitnesses" believe deputies had been watching the home for some time because they entered through the back door, as the Garners typically did. Id. at ¶118.

This claim appears to connect to the DA's Office through the alleged conspiracy. See id. at ¶116. The only factual support offered that this home entry was planned amongst multiple Defendants is temporal proximity to the report of the sexual assault. See id. No additional allegations addressing possible involvement by the DA's Office or Burkett are present. While unquestionably odd, Plaintiffs' pleadings do not address any involvement or coordination by the DA's Office or Burkett in this event, and this claim must be **DISMISSED**.

### F.  Lack of Policies and Procedures

Plaintiffs allege that "Defendant-Municipalities" have failed to generate policies to protect black males from sexual assault, constituting deliberate indifference. Id. at ¶124. Plaintiffs specifically allege that the DA's office does not:

> have a policy concerning investigation and prosecution of juvenile rape cases when the perpetrators are juvenile or are adults that are in high school, concerning taking statements from parents of rape victims, containment of rape videos, protecting youths from bullying, rape, sodomization, dissemination of child pornography.

Id. at ¶128. In support of this claim, Plaintiffs include a list of nineteen acts by Burkett and the DA's Office that they believe demonstrates the lack of an appropriate policy. See id. at ¶156.

Aside from the fact that the foundation of these allegations are disagreements with the investigatory and prosecutorial decisions made, they do not represent an independent, standalone cause of action. Rather, any alleged lack of policy is relevant only to establish municipal liability under § 1983, which Plaintiffs have failed to do through their Equal Protection, Due Process, and conspiracy claims against the DA's Office. As such, these allegations must be **DISMISSED**.

### G.  Intentional Infliction of Emotional Distress

Plaintiffs devote five paragraphs to their claim for intentional infliction of emotional distress ("IIED"). See id. at ¶¶186-90. The most detailed allegation states:

> DEFENDANTS' conduct was extreme and outrageous. Knowing that the emotional distress suffered by COMPLAINANTS was severe, DEFENDANTS desired or acted with recklessness to inflict severe emotional distress and/or knew that severe emotional distress would be certain or substantially certain to result from the violent sexual assault.

Id. at ¶187. The additional allegations discuss the actions of the perpetrators in committing the assault, reaching the conclusion that the actions of the Defendants "after the rape support that they were working in concert with the perpetrators to commit and cover-up the violent sexual act." Id. at ¶190.

Plaintiffs' pleadings tie the emotional distress suffered to the perpetrators of the crime, not the DA's Office or Burkett. To the extent the investigatory and prosecutorial decisions are meant to encompass this cause of action, the Court reiterates that these claims are not viable. Plaintiffs' IIED claim must be **DISMISSED**.

### H.  Abuse of Process

Plaintiffs' abuse of process claim appears to be against only Burkett himself, not the DA's Office. See id. at ¶¶191-93. The Amended Complaint alleges that Burkett:

> used his authority as the DISTRICT ATTORNEY to impede the prosecution … by modifying each perpetrators' bond obligations, reducing their bonds, amending their bills of information to misdemeanor hazing, in order to, impede or abuse his authority and working against the regular conduct of the proceeding with an ulterior purpose in mind.

Id. at ¶192. Burkett argues Plaintiffs have failed to state an abuse of process claim because their allegations do not encompass an irregularity in the regular course of criminal proceedings. See Record Document 5-1 at 19. Plaintiffs hold firm that the bond modifications made by Burkett are only typically made by courts themselves, and Burkett's ulterior purpose was to help the School Board evade liability. See Record Document 13 at 15.

In Louisiana, "an abuse of process claim has two essential elements: (1) the existence of an ulterior purpose and (2) a willful act in the use of the process not proper in the regular prosecution of the proceeding." No Drama, LLC v. Caluda, 15-211 (La. App.

5 Cir. 10/14/15), 177 So.3d 747, 751. Plaintiffs have sufficiently pled the first required element of this tort, arguing Burkett's dual representation and desire to avoid liability on behalf of the School Board was his ulterior motive. However, Plaintiffs fall short of demonstrating an irregularity outside the regular course of criminal prosecution. As argued in Defendants' reply memorandum, if bond modifications are exclusively the prerogative of the judiciary, then Burkett could not have unilaterally revised them absent forgery, bribery, or another illegal act. See Record Document 14 at 5. This has not been alleged by Plaintiffs. The remaining allegation constituting this claim—the charging decision—is routinely made by district attorneys in the regular scope of their positions and cannot form the basis of an abuse of process claim.

The Court agrees with Defendants. Plaintiffs' allegations defeat themselves, as they simultaneously admit that the action Burkett undertook is something he cannot do. Without this second required element, this claim must be **DISMISSED**.

## I.   Summary of Plaintiffs' Claims Against DA's Office and Burkett

The DA's Office and Burkett's Motion to Dismiss (Record Document 5) is hereby **GRANTED**. All of Plaintiffs' claims against the DA's Office and Burkett must be **DISMISSED**.

## III.   Sabine Parish School Board's Motion to Dismiss (Record Document 15)

The School Board similarly moves to dismiss all claims under Rule 12(b)(6). See Record Document 15. Addressed in its motion are Plaintiffs' (1) Equal Protection claims, (2) Due Process claims, (3) conspiracy claims, (4) First Amendment allegations, (5) lack of policy and procedure arguments, (6) IIED claims, and (7) criminal allegations. See Record Document 15-1. The School Board argues Plaintiffs' "sprawling" complaint fails

to allege sufficient facts for each of these claims or allegations, relying only on conclusory statements and unsubstantiated beliefs. Id. at 1. Plaintiffs counter with their disagreement and belief that plausible claims have been pled. See Record Document 27 at 6.

### A.  Equal Protection

The School Board breaks Plaintiffs' Equal Protection claims into two parts— (1) failure to prevent or protect P.G. from the sexual assault and (2) failure to respond appropriately to it. See Record Document 15-1 at 7. With respect to an alleged failure to protect P.G., it argues no special duty of care exists for schools to protect students from violence by private actors. See id. at 7-10. As for an inadequate response, the School Board argues Plaintiffs have failed to show their son was treated differently than similarly situated individuals and have not sufficiently pled a policy or custom to hold the School Board liable. See id. at 10-14.

### i.    Failure to Protect

First, the Court agrees that the School Board did not have a special duty to prevent the sexual assault of P.G. by private actors. In DeShaney, the Supreme Court recognized that the Due Process Clause generally does not impose upon the government an affirmative duty of care to protect its citizens against the actions of private actors. See DeShaney v. Winnebago County Dept. of Social Services, 489 U.S. 189, 196 (1989). While the Court did recognize that certain "special relationships" created or assumed by the State with regard to particular individuals may constitute an exception to this general rule, the Fifth Circuit has rejected this exception's applicability to school-sponsored activities held outside of normal school hours. See Priester v. Lowndes County, 354 F.3d 414, 422 (5th Cir. 2004); Leffall v. Dallas Independent School Dist., 28 F.3d 521, 529 (5th

Cir. 1994). Further, the Fifth Circuit has held that compulsory attendance laws alone do not create a special relationship between schools and students, while at school during normal hours. See Doe v. Hillsboro Independent School Dist., 113 F.3d 1412, 1415 (5th Cir. 1997) (joining "every circuit court that has considered the issue in holding that compulsory school attendance … does not create the custodial relationship envisioned by *DeShaney*").

While DeShaney and its progeny concern the Due Process Clause, the Fifth Circuit has "cautioned that the Equal Protection Clause should not be used to make an end-run around the *DeShaney* principle." Beltran v. City of El Paso, 367 F.3d 299, 304 (5th Cir. 2004); see also McKee v. City of Rockwall, 877 F.2d 409, 413 (5th Cir. 1989) (warning that DeShaney could easily be circumvented if plaintiffs were allowed to convert "every Due Process claim into an Equal Protection claim, via an allegation that state officers exercised their discretion to act in one situation and not another").

Plaintiffs cannot skirt DeShaney through their Equal Protection claims. The law clearly prohibits School Board liability for failing to protect P.G. from the assault at the hands of his fellow students. Plaintiffs have not pled any allegations demonstrating a special relationship between the school and P.G., outside of his compulsory attendance. See Record Document 26 at ¶¶92-93. Accordingly, to the extent Plaintiffs' Equal Protection claims are rooted in a failure to protect, those claims must be **DISMISSED**.

### ii.     Failure to Respond

The School Board argues for dismissal of any claims based on an insufficient response to the attack because of Plaintiffs' failure to provide supporting detail as to how their child was treated differently than similarly situated individuals because of his race.

See Record Document 15-1 at 11. The School Board also asserts that Plaintiffs have failed to sufficiently describe and support a policy or custom through which municipal liability could attach. See id. at 12-14. Even after Plaintiffs amended their complaint to include alleged examples of racial disparities within Many High School, the School Board continues to argue that a precisely analogous situation has not been pled. See Record Document 30.

Plaintiffs' Amended Complaint added ten paragraphs of claimed instances at Many High School where black students were allegedly treated differently than white students. See Record Document 26 at ¶¶51-60. They include descriptions of white students obtaining permission to get dressed in the coach's office instead of the locker room, the expulsion of a black student for a firearms arrest outside school hours compared to a white student who brought a gun to school and was permitted to return, and the denial of P.G.'s hardship exemption to play sports after changing schools when white students are routinely granted such exemptions. See id. Most notably, Plaintiffs also allege that the day prior to P.G.'s attack, another black student was sexually assaulted in the same manner, and the School Board failed to take action. See id. at ¶53. Plaintiffs believe that had this student or P.G. been white, the response would have been different. See id.

The School Board's position is that Plaintiffs have failed to allege a perfectly analogous situation of the sexual assault of a white student who received a more thorough and favorable investigation process, and thus, their Equal Protection claims must fail under either a traditional suspect class analysis or a "class of one" argument. See Record Document 15-1 at 11. The Court cannot accept this stance. At this early stage of the litigation, Plaintiffs have pled enough factual allegations, which if true, plausibly suggest

differential treatment based on race at Many High School. Particularly persuasive to the Court is the alleged attack on another black student the day prior to P.G., which garnered a similarly lackluster response. See id. This allegation, coupled with Plaintiffs' other alleged discriminatory instances, satisfies the need to plead differential treatment among similarly situated individuals within Many High School.

Based on these specific allegations of differential treatment, Plaintiffs have likewise met the plausibility burden for municipal liability. In order to hold a municipality, such as a school board, liable under § 1983, a plaintiff must show that (1) an official policy (2) promulgated by the municipal policymaker (3) was the moving force behind the violation of a constitutional right. See Piotrowski v. City of Houston, 237 F.3d 567, 578 (5th Cir. 2001). Plaintiffs are required to link governmental misconduct to a specific policy or custom through detailed factual allegations. See Spiller v. City of Texas City, Police Dept., 130 F.2d 162, 166-67 (5th Cir. 1997). While official policies typically exist in the form of written policy statements, ordinances, or regulations, they may also arise in the form of widespread practices that are "so common and well-settled as to constitute a custom that fairly represents municipal policy." Webster v. City of Houston, 735 F.2d 838, 841 (5th Cir. 1984). Consequently, isolated violations do not represent "persistent, often repeated, constant violations that constitute custom or policy." Bennett v. City of Slidell, 728 F.2d 762, 768 n. 3 (5th Cir. 1984).

While the Garners do not point to a specific enumerated policy for the handling of sexual assault amongst students, they repeatedly allege that a widespread practice to deny or limit sexual assault investigations of black student victims is present. Although this allegation in itself is a conclusory statement, entitled to no deference from the Court,

Plaintiffs have pled supporting allegations in the form of instances of differential treatment for white and black students. See Record Document 26 at ¶¶51-60. Once again, the Court is persuaded by the particular allegation that another black student was sexually assaulted in a similar manner the day prior to P.G. and also received a minimal response. See id. at ¶53. A second, prior, racially based assault without discipline removes what happened to P.G. from the realm of an isolated, one-off incident and plausibly suggests something more than mere negligence or failure to follow district policy. Taken in the light most favorable to Plaintiffs, this assertion and other examples of potential discriminatory treatment lead the Court to reject dismissal of Plaintiffs' Equal Protection claims at this early stage of the proceedings.

### B. Due Process

Plaintiffs' Amended Complaint adds a lengthy list of actions by the School Board that they believe constitute a Due Process violation. See Record Document 26 at ¶91. Plaintiffs' central argument is the School Board violated their substantive due process rights by failing to have policies in place to prevent sexual assaults and bullying at Many High School and abdicating their investigatory and disciplinary roles. See id. In response to the School Board's DeShaney argument, Plaintiffs plead that a "special relationship does exist between SCHOOL BOARD and its students as Louisiana law does require that students attend school." Id. at ¶92.

As discussed, DeShaney holds that an affirmative duty on behalf of schools to protect their students from private actors exists only in limited circumstances. See 489 U.S. at 196. Compulsory attendance laws alone do not create the required "special relationship" for the Due Process Clause to provide a cognizable avenue for redress.  See

Doe, 113 F.3d at 1415 (5th Cir. 1997). Consequently, Plaintiffs' Due Process claims must be **DISMISSED**.

### C.  Conspiracy

Although the Garners' conspiracy claims against Burkett and the DA's Office are foreclosed by various legal principles, these claims against the School Board remain viable because other Defendants remain in the lawsuit that the Plaintiffs allege conspired with the School Board. The Garners have plausibly pled an Equal Protection violation against this entity, and whether the remaining Defendants can or cannot be part of a conspiracy remains an open question that may be the subject of future motion practice. Until the conspiracy claims against the remaining Defendants are properly before the Court, Plaintiffs' conspiracy claims against the School Board must be permitted to proceed.

### D.  First Amendment

While discussed in the School Board's motion to dismiss, Plaintiffs do not explicitly assert a First Amendment claim, nor do they address such a violation in their opposition memorandum. The Court is unable to ascertain any logical basis for a First Amendment claim based on Plaintiffs' allegations. As such, to the extent any claim was intended to be asserted under the First Amendment, it is hereby **DISMISSED**.

### E.  Policies, Procedures, or Lack Thereof

While Plaintiffs' pleadings contain a section of allegations concerning deficient or nonexistent policies and procedures regarding sexual assault in school or the investigation of student crime, these do not constitute independent, standalone claims for relief. Instead, these allegations must be tied to possible § 1983 municipal liability, which

relies upon a policy or custom showing. As set forth above, Plaintiffs have demonstrated a viable Equal Protection claim against the School Board, partly based on a possible custom of racial discrimination towards black students. This set of allegations included in Plaintiffs' Amended Complaint, albeit not claims in themselves, may proceed alongside the Garners' Equal Protection claims.

### F.  Intentional Infliction of Emotional Distress

While somewhat amorphously pled in their Amended Complaint, Plaintiffs argue the School Board committed the state law tort of IIED through its actions and inactions following P.G.'s assault. See Record Document 27 at 13. Specifically, they challenge the School Board's failure to inform the Garners of the assault and to report the crime to a law enforcement agency, failure to grant P.G.'s sports hardship exemption and award him his lettermen's jacket, and decision to force P.G. to attend school online, which together they believe were designed to harass P.G. and suppress the sexual assault. See id. The School Board argues these actions fail to satisfy IIED's essential elements. See Record Document 15-1 at 22.

"In order to prove a claim for intentional infliction of emotional distress, a plaintiff must show (1) that the conduct of the defendant was extreme and outrageous; (2) that the emotional distress suffered by the plaintiff was severe; and (3) that the defendant desired to inflict severe emotional distress or knew that severe emotional distress would be certain or substantially certain to result from his conduct." Yazdi v. Lafayette Parish School Board, 2019 WL 4805835 at *6 (W.D. La. Sept. 30, 2019) (citing White v. Monsanto Co., 585 So.2d 1205, 1209 (La. 1991)). Extreme and outrageous conduct is

that which goes "beyond all bounds of decency, [so as] to be regarded as atrocious and utterly intolerable in a civilized community." Id.

The post-assault actions by the School Board that comprise Plaintiffs' IIED claim do not rise to the level of extreme and outrageous conduct. Plaintiffs' pleadings link the assault itself to their son's emotional distress, and although the School Board's decisions in its aftermath are questionable, they do not approach the "utterly intolerable" standard required to state a claim for IIED. Accordingly, this claim must be **DISMISSED**.

### G.  Criminal Allegations

Finally, the School Board seeks to address Plaintiffs' references of criminal conduct. See Record Document 15-1 at 24. Plaintiffs allege generally that the Defendants' actions in this case "arise [sic] to the level of Accessory After the Fact of Sexual Battery, 2nd Degree Kidnapping, Distribution of Child Pornography, Assault, Battery, and other crimes under Louisiana State Criminal law." Record Document 26 at ¶187. The Court need not devote serious attention to these wild allegations and reminds Plaintiffs they are pursuing a civil action in a United States federal district court. Any criminal allegations made against the School Board are hereby **DISMISSED**.

### H.  Summary of Plaintiffs' Claims Against the School Board

The School Board's Motion to Dismiss (Record Document 15) is hereby **GRANTED IN PART** and **DENIED IN PART**. Plaintiffs' Equal Protection claims founded on an inadequate response and their conspiracy claims remain, but all other remaining claims and allegations must be **DISMISSED**.

IV.     **Sabine Parish Sheriff's Department's Motion to Dismiss (Record Document 21)**

The final pending motion to dismiss in this matter has been resolved. Plaintiffs' original filing named the Sabine Parish Sheriff's Department ("Sheriff's Department") through Sheriff Aaron Mitchell ("Mitchell") as a Defendant. See Record Document 1 at ¶8. The Sheriff's Department moved for dismissal from the suit as an entity lacking the capacity to be sued. See Record Document 21-1. Plaintiffs agreed with this argument, and their Amended Complaint now pursues Mitchell in his official capacity. See Record Document 26 at ¶8. As a result of this correction, the Sheriff's Department's Motion to Dismiss (Record Document 21) is hereby **DENIED AS MOOT**.

## CONCLUSION

The instant case presents serious allegations stemming from a horrific incident. While many of Plaintiffs' claims must be dismissed as nonviable or insufficiently pled, claims for an Equal Protection violation and potential conspiracy against the School Board may proceed. An order consistent with the terms of this ruling shall issue herewith.

**THUS DONE AND SIGNED** in Shreveport, Louisiana on this 9th day of September, 2021.

S. MAURICE HICKS, JR., CHIEF JUDGE
UNITED STATES DISTRICT COURT